**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

_____

JANEEN ARBLE,

      Plaintiff,

    v.                                        No. 10cv147 WJ/WDS

STATE FARM MUTUAL INS. CO.,

      Defendant.

**AMENDED**[1]
**MEMORANDUM OPINION AND ORDER**
**GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

      THIS MATTER comes before the Court upon Defendant's Motion for Summary

Judgment, filed November 22, 2010 **(Doc. 52)**.  Having considered the parties' briefs and the

applicable law, I find that Defendant's motion is well-taken and will be granted.

**Background**

      In this case, Plaintiff alleges that Defendant, her insurer, disregarded her contractual

rights by denying her insurance claim, made under her policy to compensate her for the theft of

her vehicle.  Plaintiff filed the complaint in Second Judicial District Court, Bernalillo County,

and Defendant removed the case to federal court. The complaint asserts claims of breach of

contract, insurance bad faith, violation of the Insurance code (NMSA 1978, § 59A-16-20), and

the Unfair Practices Act (§ 57-12-1, _et seq_.).  Plaintiff also seeks declaratory judgment against

Defendant.  She contends that Defendant's position that her vehicle was not stolen could not be

substantiated through State Farm's investigation and that its refusal to pay Plaintiff's theft claim

---

      [1] This Memorandum Opinion and Order is being amended for the sole purpose of
correcting the filing date of Defendant's Motion for Summary Judgment.

was a breach of contract, was conducted in bad faith, and was a violation of the New Mexico Insurance Code or New Mexico Unfair Practices Act.

Plaintiff "disputes" most of the facts presented by Defendant in this motion, but the Court finds none of them sufficient to ensure the survival of Plaintiff's claims. In short, Plaintiff unsuccessfully challenges testimony presented by defense experts, and relies on witness testimony that does not sufficiently rebut the overwhelming evidence presented by Defendant. The facts in this case are best represented by the position taken by both parties.

**I.      Factual Background Relative to Parties' Positions**[2]

Plaintiff alleges that on or about February 20, 2009, her vehicle, a 2008 Chrysler Sebring, was stolen from the Albuquerque Airport long-term parking lot and taken to another place where it was burned. State Farm denied the claim on the basis that its investigation indicated that the car was not stolen. Plaintiff maintains that she was in Arizona at the time of the theft of her vehicle. In this motion, Defendant contends that Plaintiff's causes of action for bad faith and violations of the Insurance Code and of the Unfair Practices Act all fail as a matter of law.

A.      <u>Facts Relative to Defendant's Position</u>

Defendant's denial of Plaintiff's insurance claim was based on what Defendant calls "suspicious loss indicators," including eyewitness reports, and a forensic examination of the charred vehicle. Defendant's position is, to a large extent, based on the forensic analysis of the car's charred remains, which was performed by automotive forensic expert Michael Hearrold. Mr. Hearrold found that the same key used to regularly start Plaintiff's car was also used to

---

[2] Both parties have chosen to designate exhibits by letter. The Court will therefore designate whether the exhibits are those of Plaintiff or Defendant. Also, because Defendant did not continue the alphabet chronologically in the reply, the Court will designate whether the referenced exhibit is attached to the motion or the reply.

transport the vehicle to the place where the car was burned, and that the steering column anti-theft features of the car were not compromised.  Deft's Ex. C at 98:14–16.  Given that Plaintiff stated she had the car keys in her possession when the loss occurred, Mr. Hearrold concluded that Plaintiff's car was not stolen.  Defendant also relied on witness reports.  One witness, Mr. Russell Garrett, reported seeing Plaintiff's burnt car at the location where the vehicle was ultimately recovered (an office parking lot) prior to the time Plaintiff asserted she parked her car at the airport.  Plaintiff stated that she was driving the car at 10:00 a.m. on Friday morning, February 20, 2009, when she parked it at the airport for her flight out of town.  Mr. Garrett told a State Farm investigator that he saw the car at 7:00 and 7:30 that same morning, already burned, in the dirt lot next to his business.

A more detailed explanation of Mr. Hearrold's opinion is helpful at this point.[3] Plaintiff's vehicle was transponder-equipped, which is significant in this case in determining whether a theft had occurred.  At the *Daubert* evidentiary hearing, and in his opinion, Mr. Hearrold described the ignition mechanism of a car that is transponder-equipped:

> . . . the turn of a key in the ignition lock sends a signal or code through a transponder chip which, if recognized by the system, causes the car to start up.  If the code is not recognized, the car engine dies within two seconds. The actual lock mechanism contains inner and outer lock cylinders.  The inner cylinder holds lock wafers and a spring.  The wafers have anti-theft grooves.  Markings will be evident on the lock wafers when a key that is not normally used is used to start the car.  Different  "wear-off" material (types of damage marks) on the wafer's contact surface will be visible on microscopic examination, depending on what is used in trying to start the car other than the normal key.

Doc. 88 at 5.  In his own microscopic analysis of the lock mechanism belonging to Plaintiff's

---

[3]  *See* Doc. 88 for the Court's Memorandum Opinion and Order following the *Daubert* hearing regarding Mr. Hearrold's testimony, in which the Court denied Plaintiff's motion to exclude Mr. Hearrold's testimony, finding that Mr. Hearrold's testimony satisfied *Daubert's* requirements regarding expert qualifications and reliability of methodology used.  Doc. 83.

burnt car, Mr. Hearrold found no markings which could be evidence of forced rotation or prying. He found no tool marks on the ignition lock consistent with lock picking or with a theft of the vehicle, which meant that the ignition had not been broken, the lock cylinder had not been removed, and that there was no forced entry or compromise of the anti-theft system.  This meant that the electronic signal of the transponder had started the car and the steering column lock.  Mr. Hearrold also found no evidence of mechanical tampering or override of the systems that would have allowed the car to be driven without the proper transponder key.  He thus concluded that the steering column and anti-theft features of Plaintiff's car had not been compromised and that the key regularly used to start the vehicle was used to transport the vehicle to the location where the vehicle was found burned.

Defendant's denial of theft coverage also considered other investigative findings, including the opinion testimony of Neils L. Pearson, an attorney experienced in the insurance field.  In his comprehensive review of the claims file, Mr. Pearson reviewed the report of the Albuquerque Fire Department which stated that the fire had been intentionally set and was suspicious.  Mr. Pearson's report cites to other "suspicious loss indicators" regarding Plaintiff's claim: the fact that Ms. Arble has a history of prior vehicle theft/partial theft claims; that the outstanding balance on Plaintiff's car exceeded its value by more than $10,000 for which Plaintiff purchased gap insurance; and that her monthly income could not meet her monthly expenses.

B.    Facts Relative to Plaintiff's Position

Plaintiff contends that Mr. Hearrold's findings are not necessarily supported by evidence, arguing that the car could have been stolen in ways other than using the normally used key. Plaintiff also disputes the integrity of eyewitness testimony on which Defendant relies for the

4

proposition that Plaintiff's car was seen burned prior to the time Plaintiff states she left the car at the airport parking lot.  Mr. Garrett stated that he saw a burnt car in the lot outside of his office building on Friday morning, but he then stated on cross-examination at his deposition that it might have been on a Saturday.  Pltff's Ex. B at 29:24–30:1.  According to Mr. Pearson's report, another witness, John Brannon, who also worked in the office complex near where the car was recovered, heard a loud boom and smelled something burning.  When he went outside the door of his building, Mr. Brannon saw a vehicle burning.  Mr. Brannon recalled that he was working late that evening when he heard an explosion and saw a burning vehicle.  He remembered this occurring sometime between 6 and 8 p.m., and believed that it was Saturday evening.  He called emergency services but was told that emergency vehicles had already been dispatched.  Pltff's Ex. C at 6–8.

Plaintiff points out that video tapes of the toll booth lanes in the airport parking lot were available, including tapes corresponding to the relevant dates in this lawsuit.  Video cameras were placed in the toll booths showing the immediate work area of the cashier (to aid in disputes involving payment for parking), and outside the toll booths where license plates could be visible. Pltff's Ex. E at 7–8.  The tapes could be preserved for thirty days or longer on request.  Pltff's Ex. F 6:21– 7:24. The State Farm investigator never made a request for those tapes.  By the time that Plaintiff was notified that her claim was denied — six months after she left her car in the airport parking lot— the video tapes had been destroyed.  Plaintiff contends that the tapes would have shown that Plaintiff's car was stolen.

## II.    Legal Standard

Summary judgment is appropriate when there are no genuinely disputed issues of material fact and, viewing the record in the light most favorable to the non-moving party, the

movant is entitled to judgment as a matter of law. *Bruner v. Baker*, 506 F.3d 1021, 1025 (10th Cir. 2007). Once the party moving for summary judgment properly supports its motion, it is incumbent on the non-moving party to respond with some showing of an issue of genuine material fact. *Allen v. Denver Pub. Sch. Bd.*, 928 F.2d 978 (10th Cir. 1991), *overruled on other grounds by Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1228 (10th Cir. 2000). The non-moving party may not rest on averments in its pleadings, but instead must establish specific triable issues. *Gonzales v. Miller Cas. Ins. Co. of Texas*, 923 F.2d 1417 (10th Cir. 1991). The mere existence of some alleged, immaterial factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).

## Discussion

Defendant contends that it is entitled to judgment as a matter of law on all of Plaintiff's claims because its denial of Plaintiff's insurance claim was reasonable based upon its investigation. Plaintiff alleges that State Farm has failed and refused to reasonably and timely conduct an adequate investigation into the facts and circumstances of Plaintiff's claims, has failed to communicate and notify Plaintiff of State Farm's position on the claims, and has placed its own financial interests above those of the policyholder.

A.    Insurance Bad Faith

An insurance company acts in bad faith when it refuses to pay a claim of the policyholder for reasons which are frivolous or unfounded. In deciding whether to pay a claim, the insurance company must act reasonably under the circumstances to conduct a timely and fair investigation of the claim. An insurance company does not act in bad faith by denying a claim for reasons which are reasonable under the terms of the policy. NM UJI 13-1702. Bad faith on the part of

6

an insurer means a frivolous or unfounded refusal to pay.  *Chavez v. Chenoweth*, 89 N.M. 423

(N.M.App. 1976) (citing *State Farm General Insurance Company v. Clifton*, 86 N.M. 757

(1974)).  The New Mexico Supreme Court has defined "unfounded" in this context:

> "Unfounded" in this context does not mean "erroneous" or "incorrect"; it means
> essentially the same thing as "reckless disregard," in which the insurer "utterly
> fail[s] to exercise care for the interests of the insured in denying or delaying
> payment on an insurance policy." . . . It means an utter or total lack of foundation
> for an assertion of nonliability — an arbitrary or baseless refusal to pay, lacking
> any arguable support in the wording of the insurance policy or the circumstances
> surrounding the claim.  It is synonymous with the word with which it is coupled:
> "frivolous."

*Sloan v. State Farm Mut. Auto. Ins. Co.*, 135 N.M. 106, 113 (2004).  The insurer's action in

denying coverage must rest upon a reasonable basis. Where payment of policy proceeds depends

on an issue of law or fact that is "fairly debatable," the insurer is entitled to debate that issue.

*United Nuclear Corp. v. Allendale Mutual Insurance Co.*, 103 N.M. 480 (1985).

      *1.*    *Mr. Pearson's Insurance Report.*

      Plaintiff does not dispute the actual factual findings in Mr. Pearson's report.  *See* Deft's

Statem. of Undisp. Fact No. 14 (undisputed by Plaintiff).  However, Plaintiff does challenge the

admissibility of Mr. Pearson's report on the basis that it impermissibly comes to the legal

conclusion that State Farm conducted a full and more than adequate investigation of Plaintiff's

claim.  State Farm argues that Plaintiff has no legal basis from which to challenge the

admissibility of Mr. Pearson's report because Plaintiff's counsel never took Mr. Pearson's

deposition, nor designated his own insurance expert to testify on Plaintiff's behalf.  Plaintiff's

counsel counters this argument by stating that he "intends to challenge the admissibility of such

testimony at trial. . . ." Resp. at 8.

      The Court finds no reason that it should not consider Mr. Pearson's factual findings in

7

ruling on the instant motion.  Plaintiff's counsel has not done anything to challenge the admissibility of Mr. Pearson's report for summary judgment purposes, which is before the Court at this time.[4]

    2.    *Witness Testimony*

It would seem as though Plaintiff has created disputed factual issues concerning the time frame when Plaintiff's car was actually burned.  However, while Mr. Garrett admitted that he could not rule out that he might have seen the burnt car on Saturday instead of Friday, he also admitted that he was more certain of the testimony he gave closer to the time he talked with State Farm.  Reply Ex. A at 28:11–19.  That testimony Mr. Garrett gave close to the time of the investigation was that he saw the car on Friday.  This is consistent with Defendant's position that Plaintiff's car was seen burnt at the location where the car was ultimately recovered prior to the time Plaintiff asserted she parked her car at the airport.

Defendant discusses Mr. Garrett's testimony, but does not mention the testimony given by Mr. Brannon, who claimed to see a burning car outside of his office building over the weekend of February 20th through the 22nd.  Pltff's Ex. C at 6:1–20.  However, as is noted in Mr. Pearson's report, Mr. Brannon's recollection was not certain that he saw the car on a Saturday, particularly.

    3.    *Video Surveillance Tapes.*

The deposition testimony offered by Plaintiff suggests that State Farm could have obtained the airport parking lot video tapes just for the asking, but Defendant presents deposition

---

[4]  Plaintiff's counsel apparently considered it appropriate and necessary to challenge Mr. Hearrold's testimony in a *Daubert* motion (albeit unsuccessfully), but he has filed no *Daubert* motion for the purpose of challenging Mr. Pearson's opinion.

testimony indicating that these tapes cannot be released without a request by the police.  Ex. D (Reply) at 38:19–24.  Mr. Pearson noted in his report that the tapes would "only be available upon a formal police inquiry."  Deft's Ex. D (Mot.) at 3.  There is no evidence that a police inquiry was involved in this case.  Further, even the deposition testimony submitted by Plaintiff suggests that the tapes would not have shown the drivers of the cars going through the parking lanes, or the license plates of all the cars.  Pltff's Ex. E at 8–9.

    4.    *Challenges to Mr. Hearrold's Testimony*

Mr. Hearrold's testimony strongly advocates for Defendant's decision to reject Plaintiff's insurance claim.  Plaintiff does not present any facts which materially dispute Mr. Hearrold's findings, either in the form of expert testimony or challenges which would render those findings unreliable.  All of Plaintiff's challenges to these findings were adequately met by Mr. Hearrold's explanations at the hearing and in his opinion, thus leaving Mr. Hearrold's expert opinion intact and undisputed.[5]

The best Plaintiff can do is offer alternatives to Mr. Hearrold's findings, but none of these alternatives have any weight.  For example, Plaintiff contends that the car could have been stolen by using other keys.  Mr. Hearrold testified that any key other than the normally used key— including additional programmed keys— would leave a visible imprint on the contact surface of the lock.  Plaintiff points out that Mr. Hearrold himself suggested other ways that Plaintiff's car might have been stolen.  Pltff's Ex. D at 20:17–25.  However, Mr. Hearrold stated

---

[5]  The Court previously ruled that the testimony of Plaintiff's expert, Mr. Rob Painter, would be limited only to *Daubert* hearing testimony challenging Mr. Hearrold's opinion because Plaintiff had failed to make proper Rule 26 expert witness disclosures.  *See* Doc. 68 at 6 (Mr. Painter's testimony "shall not be admissible for any purpose other than for a *Daubert* inquiry.").  Thus, the only expert testimony admissible for summary judgment purposes is that of Mr. Hearrold.

that only "professionals . . . really have the time and trouble and the equipment" to steal a car by

such methods.  Ex. D at 20:19–22.  He also explained that even if a lock system is compromised,

the vehicle's anti-theft system would still prevent it from being driven.

    In considering all the evidence, I must keep in mind the substantive law of Plaintiff's bad

faith claim.  Thus, any dispute of fact must be material enough to call into question the

reasonableness of Defendant's investigation.  I find that none of the factual disputes create an

issue of fact suggesting that State Farms refusal to pay Plaintiff's claim was either frivolous or

unfounded.

    Plaintiff disputes the existence of "suspicious loss indicators" described by Mr. Pearson,

and also rebuts the substance of Mr. Brannon's testimony.  She states in her affidavit that

Defendant's assertions regarding her overstatement of annual income, her prior history of auto

theft claims, or her financial difficulties, are not true.  Pltff's Ex. A, ¶ 3.  However, even

assuming the accuracy as to all of these loss indicators, there are still insufficient material facts

which would create an issue for Plaintiff's bad faith claim to survive this motion.  *See Anderson

v. Liberty Lobby*, 477 U.S. 242, 252 (1986) (holding theat a mere scintilla of evidence in

nonmovant's favor is not sufficient).  The remainder of Mr. Pearson's findings remain

unchallenged.[6]  State Farm acted immediately on investigating Plaintiff's claim, sending it to the

investigative unit within three days of receiving the claim.  Deft's Ex. D (Mot.) at 6.  The unit

canvassed witnesses in the vicinity of the area where Plaintiff's burned convertible was

recovered.  The report of the Albuquerque Fire Department stated that the fire had been

intentionally set and was "suspicious."  Ex. D at 3.

---

    [6]  The Court here refers to Mr. Pearson's factual findings in his report, and not his
ultimate conclusion that State Farm did not act in bad faith in investigating Plaintiff's claim.

Defendant's failure to request the video tapes of the airport parking lot also does not create a material issue of fact for the bad-faith claim. The tapes were not obtainable without a formal police request, and there is no evidence that a police inquiry was occurring.[7] Further, it is questionable— if not speculative— as to what the tapes could show which would sufficiently dispel other strong findings that Plaintiff's car was not in fact stolen. At any rate, Defendant's failure to request the tapes was not in reckless disregard of Plaintiff's interests under her insurance policy.

The only arguable factual disputes raised by Plaintiff are the lack of complete agreement in eyewitness testimony, the question of whether State Farm should have requested the airport parking lot video tapes, and Plaintiff's dispute of her financial condition as one of the "suspicious loss indicators." However, those disputes are not sufficiently "material" to create the inference that State Farm acted unreasonably under the circumstances to conduct a timely and fair investigation of the claim, or that its denial of Plaintiff's claim was not reasonable under the terms of the policy which provided for coverage in the event of a theft. Mr. Hearrold's analysis was thorough and his findings and conclusion remain undisputed. Mr. Pearson's factual findings in his report (except for Plaintiff's objection to the characterization of her financial status or claim history), are also undisputed. Any discrepancy in Mr. Brannon's eyewitness testimony is weak, and it is speculative whether the video tapes would have shown any evidence supporting Plaintiff's position that the car was stolen. Accordingly, the Court finds it undisputed that its denial of coverage to Plaintiff rested on a reasonable basis, and thus Defendant is entitled to summary judgment on Plaintiff's bad-faith claim.

---

[7] Moreover, Plaintiff could have reported her car as stolen, which would have triggered a thorough police inquiry and likely made the video tapes much easier to obtain.

911bfa80f7996111

B.     Unfair Practices Act and Unfair Insurance Practices Act

Plaintiff claims State Farms conduct in handling her claim constituted both unfair and

unconscionable practices, in violation of New Mexico Unfair Practices Act, NMSA 1978 §§ 57-

12-1 *et seq.* ("UPA") and Section 59A-16-20 of the Insurance Code ("UIPA") which sets out and

defines prohibited claims practices.

*1.     Substantive Law: UPA*

The UPA prohibits "unfair or deceptive trade practices and unconscionable trade

practices in the conduct of any trade or commerce."  NMSA § 57-12-3.

The UPA defines "unfair or deceptive trade practice" as

> an act specifically declared unlawful pursuant to the Unfair Practices Act, a false
> or misleading oral or written statement, visual description or other representation
> of any kind knowingly made in connection with the sale, lease, rental or loan of
> goods or services or in the extension of credit or in the collection of debts by a
> person in the regular course of the person's trade or commerce, that may, tends to
> or does deceive or mislead any person . . . .

NMSA § 57-12-2(D).  Representations that are considered "unfair or deceptive trade practices,"

and are thus actionable under the UPA, can be any one of the eighteen enumerated unfair

practices listed under § 57-12-2(D).  Plaintiff claims that two of these are relevant to Plaintiff's

claims, namely: using exaggeration, innuendo or ambiguity as to a material fact or failing to state

a material fact if doing so deceives or tends to deceive (§ 57-12-2(D)(14)) and stating that a

transaction involves rights, remedies or obligations that it does not involve (§ 57-12-2(D)(15)).

The UPA defines "unconscionable trade practice" as

> an act or practice in connection with the sale, lease, rental or loan, or in
> connection with the offering for sale, lease, rental or loan, of any goods or
> services, including services provided by licensed professionals, or in the
> extension of credit or in the collection of debts that to a person's detriment . . . .

NMSA § 57-12-2(E).

12

Four elements must be established to invoke the Unfair Practices Act.  A plaintiff must show (1) that the defendant made an "oral or written statement, visual description or other representation . . . that was either false or misleading"; (2) the false or misleading representation must have been "knowingly made in connection with the sale, lease, rental or loan of goods or services in the extension of credit or . . . collection of debts"; (3) the conduct complained of must have occurred in the regular course of the defendant's trade or commerce; and (4) the representation must have been of the type that "may, tends to or does, deceive or mislead any person." *Ashlock v. Sunwest Bank of Roswell, N.A.*, 107 N.M. 100, 101, 753 P.2d 346, 347 (1988); NMSA 1978, § 57-12-2(C).

2.     *Substantive Law: UIPA*

The UIPA sets out prohibited practices with respect to claims, by an insurer or other persons, which are defined as unfair and deceptive practices.  NMSA 1978, § 59A-16-20.  The list is comprehensive and includes, for example: misrepresenting to insureds pertinent facts or policy provisions relating to coverages at issue; failing to acknowledge and act reasonably promptly upon communications with respect to claims from insureds arising under policies; failing to adopt and implement reasonable standards for the prompt investigation and processing of insureds' claims arising under policies; and failing to affirm or deny coverage of claims of insureds within a reasonable time after proof of loss requirements under the policy have been completed and submitted by the insured.

3.     *Analysis of Plaintiff's claims under the UPA and the UIPA*

Plaintiff asserts that Defendant violated the UIPA by misrepresenting facts and policy provisions; by failing to act reasonably promptly upon her claim; by failing to implement and adopt reasonable standards for processing her claim; and by failing to affirm or deny coverage

13

within a reasonable time after proof of loss was made.  Plaintiff also alleges a UPA violation, but does not specify which UPA provision Defendant allegedly violated.

Plaintiff's UPA and UIPA claims suffer from the same lack of material factual disputes as does the bad-faith claim.  Defendant referred Plaintiff's claim to the investigative unit within three days of the claim submission.  It considered the Fire Department report, interviewed Plaintiff, canvassed independent witnesses, and had the vehicle debris examined by a forensic expert.  Plaintiff claims that her insurance claim was denied approximately six months after her car was allegedly stolen.  Pltff's Ex. A, ¶ 11.  Plaintiff does not submit any facts which would suggest that this length of time is unreasonable, given the breadth, scope and purpose of State Farm's investigation.  It is undisputed that State Farm's investigation in Plaintiff's claim involved an inquiry into whether fraud was involved, and this inquiry was justified as well as required by law.  As Mr. Pearson noted in his report, an insurer is required by law to "aggressively confront the problem of insurance fraud."  NMSA 1978 § 59A-16C-2 1978 ("Insurance Fraud Act").

Plaintiff relies on *G&G Servs., Inc. v. Agora Syndicate, Inc.*, to argue that Defendant failed to adequately investigate her claim. 128 N.M. 434, 993 P.2d 751, *reh'g granted, cert. granted in part and denied in part*, 128 N.M. 690, 997 P.2d 822 (Feb 18, 2000), *cert. quashe*d, 129 N.M. 520, 10 P.3d 844 (Oct 06, 2000). The UIPA defines as a prohibited practice a failure "to adopt and implement reasonable standards for the prompt investigation and processing of insureds' claims arising under policies."  NMSA 1978 § 59A-16-20(C).  *G&G Services* involved an alleged breach of a duty to defend which was asserted as a violation of the UIPA, and the investigation conducted in that case was solely in the context of an investigation by the insurer to determine whether it had a duty to defend.  There is no claim in this case that State Farm

14

abandoned its duty to defend Plaintiff except in the context of the adequacy of Defendant's investigation. Plaintiff frames the UIPA claim in the context of a failure to adequately investigate her claim that her car was stolen, but based on the evidence in the record thus far, I find that the claim was adequately investigated.  There were sufficient indicators present to require Defendant to resist payment on Plaintiff's claim and to refuse to pay out the claim upon completion of the investigation.  Therefore, I find no merit to Plaintiff's UIPA claim, based on a lack of disputed material facts which would infer that Defendant violated the UIPA.

A UPA claim involves allegations of some kind of misstatement or misrepresentation. There is no evidence to support this claim, either.[8]  Moreover, the viability of a UPA claim hinges on the success of Plaintiff's bad-faith claim.  The "goods" contracted for was coverage in the event of theft.  Pltff's Ex. A, ¶ 15.  The policy did not cover her in the event of fraud, or what State Farm concluded after a reasonable investigation, to be fraud.  Thus, if Defendant, following such an investigation, determined that the car was not stolen, Plaintiff cannot be said to have been denied any goods or services contracted for with State Farm.  Based on my findings here regarding the adequacy of Defendant's investigation, Defendant did not misrepresent the coverage purchased on the vehicle.

C.    Breach of Contract

Defendant moves for dismissal of Plaintiff's breach of contract claim, contending that a breach of contract claim does not in itself constitute a UPA claim.  Insofar as Plaintiff alleges a breach of contract claim in the context of a UPA claim, dismissal is appropriate.  A breach of

---

[8] It is not clear how Plaintiff's allegations of failure to investigate comes within one of the prohibited "unfair or deceptive" trade practices listed under the UPA in 57-12-2(D)(1)–(18) or E(1)–(2).  Even assuming such an allegation can fit within the contours of a UPA claim, Plaintiff offers insufficient material facts to withstand summary judgment on this claim.

contract is not a UPA violation unless all four of the required elements are met under the Act. *See Stevenson v. Louis Dreyfus Corp.*, 112 N.M. 97, 100, 811 P.2d 1308 (1991).

The complaint alleges a freestanding breach-of-contract claim based on assertions that Defendant delayed, denied and attempted to obscure its obligations to Plaintiff under the terms of the insurance contract.  Compl., ¶¶ 14-16.  However, Plaintiff's response also discusses the breach-of-contract claim in the context of a UPA violation only, thus appearing to waive a freestanding contract claim.  Further, Plaintiff does not specify anywhere what provision of the insurance contract was allegedly breached, for example, whether the alleged breach concerned a failure to adequately investigate, or some other provision.

D.      Punitive Damages and Attorney Fees

Plaintiff's claim for punitive damages must be denied in light of my findings related to the merits of her substantive claims.  *See* NMRA Civ. UJI 13-1827 (punitive damages considered only after recovery of compensatory or nominal damages).

Plaintiff also requests attorney fees, which shall be denied because Plaintiff has not prevailed against Defendant.[9]

**THEREFORE,**

**IT IS ORDERED** that Defendant's Motion for Summary Judgment **(Doc. 52)** is hereby GRANTED for reasons described in this Memorandum Opinion and Order.

Final Judgment in favor of Defendant shall be entered separately.

_____

_____

[9] *See* NMSA 1978 § 39-2-1 (In an action "where an insured prevails against an insurer who has not paid a claim on any type of first party coverage, the insured person may be awarded reasonable attorney's fees and costs of the action upon a finding by the court that the insurer acted unreasonably in failing to pay the claim.").

UNITED STATES DISTRICT JUDGE